**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**APR 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff - Appellant,

v.

LUZ MARIA VALENZUELA,

    Defendant - Appellee.

No. 03-2210

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. No. CR-03-218-JC)**

Laura Fashing, Assistant United States Attorney, (David C. Iglesias, United States Attorney, with her on the brief), Albuquerque, New Mexico, for Plaintiff - Appellant.

Rosanne Camunez, Las Cruces, New Mexico, for Defendant - Appellee.

Before **KELLY**, Circuit Judge, **BRORBY**, Senior Circuit Judge and **HARTZ**, Circuit Judge.

**KELLY**, Circuit Judge.

    The government appeals from an order of the district court granting

Defendant-Appellee Luz Maria Valenzuela's motion to suppress statements made

after her arrest. Ms. Valenzuela and a codefendant were indicted for conspiracy to possess with intent to distribute 100 kilograms or more of marijuana, 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B), and possession with intent to distribute 100 kilograms or more of marijuana, 21 U.S.C. § 841(a)(1), (b)(1)(B) and 18 U.S.C. § 2. The district court held that Ms. Valenzuela was arrested without probable cause at roadside when she was handcuffed and brought to the border patrol station. Accordingly, the district suppressed her post-arrest statements. We have jurisdiction pursuant to 18 U.S.C. § 3731, and we affirm.

## Background

On November 21, 2002, at about 9:00 a.m., Border Patrol Agent Eugene Lewis was driving southbound on New Mexico State Highway 11. Highway 11 is the main route for northbound traffic going through Deming, New Mexico to Interstate 10. About four miles south of Deming, Agent Lewis observed a white Chevrolet pickup truck driving northbound with an American flag displayed on the hood and an American flag screen on the rear window. The truck bore an Arizona license plate. A maroon Cadillac was traveling in the same direction two or three cars behind the pickup truck and also bore an Arizona license plate. The truck and Cadillac aroused Agent Lewis's suspicions because of several recent alien smuggling cases involving Arizona vehicles. Agent Lewis turned around to

get a closer look at the two vehicles.

As Agent Lewis approached the Cadillac, he noticed it was covered in a fine layer of dust, as if it had recently been driven on a dirt road. Agent Lewis also noticed that there was something odd about the bumper holding the trim in place, and that the Cadillac was weighted down in the back.

As Agent Lewis passed the Cadillac, the driver slowed down so that he was now further behind the pickup truck. The driver appeared to grip the wheel tightly and looked straight ahead without looking at the agent or otherwise acknowledging the agent's presence. Agent Lewis radioed in a check on the vehicle's registration, a stolen vehicle check, and a 72-hour lane check. The 72-hour lane check revealed that the Cadillac had not crossed into the United States from Mexico within the preceding 72 hours; the registration check showed that the owner of the Cadillac was a female, but Agent Lewis had seen that the driver was a male.

Continuing on Highway 11, Agent Lewis passed the Cadillac and the two vehicles that were between the Cadillac and the pickup truck. As he passed the pickup truck, the Agent Lewis saw the driver's head was resting on his or her hand, and the hand was covering the left side of the driver's face so that Agent Lewis could not determine whether the driver was male or female.

Agent Lewis continued to drive towards Deming, where he pulled over to

get a second look at the Cadillac. He again noticed that the Cadillac appeared to be weighted down in the back, and radioed Agent Richard Huerta to assist in stopping the Cadillac. Agent Lewis then pulled back onto Highway 11 to follow the Cadillac, but was unable to get directly behind it because of traffic.

Agent Lewis next saw the two vehicles in Deming, and noted that the Cadillac sometimes traveled directly behind the pickup truck. Agent Lewis lost sight of the vehicles where Highway 11 passes under Interstate 10. In total, the two vehicles went through two stop signs and three stop lights from the point where Agent Lewis first observed them on Highway 11 to where they entered Interstate 10, approximately seven miles later.

Because both vehicles had Arizona plates, Agent Lewis suspected that they were driving in tandem and would turn onto westbound Interstate 10 towards Arizona. About eight miles from the intersection of Highway 11 and Interstate 10, Agent Lewis spotted the Cadillac as it was changing lanes and passing other vehicles. Agent Lewis sped up, and as he approached the Cadillac, he also saw that the pickup truck was about a quarter mile behind the Cadillac. Several tractor trailers and other vehicles were between the Cadillac and the pickup truck.

Agent Lewis passed the pickup truck, and pulled in behind the Cadillac. The Cadillac, which had been traveling at about 80 miles per hour in a 75 mile per hour zone, then slowed down to about 50-60 miles per hour. The pickup truck

then passed Agent Lewis and the Cadillac, at which point Agent Lewis radioed Agent Huerta to tell him to look for it. Agent Lewis activated his emergency equipment and stopped the Cadillac.

Agent Lewis approached the driver, Julio Armando Reynaga-Cortes, and questioned him about his citizenship. At first Mr. Renaga acted confused, but then he said that he was from Mexico. Upon Agent Lewis's request, Mr. Reynaga produced two Republic of Mexico passports. Mr. Reynaga was visibly nervous and unable to locate the Visas in the passports. Agent Lewis then asked to see what was in the trunk. At first, Mr. Reynaga asked why he wanted to know, but upon repeated requests, Mr. Reynaga opened the trunk. Inside were bundles of marijuana.

Mr. Reynaga said he did not know the vehicle had anything in the trunk, and that he had picked up the vehicle at the Fina gas station in Columbus. Mr. Reynaga did not indicate that he was traveling with the pickup truck, nor was he asked any questions about the pickup truck at that point.

Agent Lewis then radioed Agent Huerta, informed him that marijuana had been found in the Cadillac and that the two vehicles were traveling in tandem, and asked Agent Huerta to stop the pickup truck and see if he could transport the driver to the Deming border patrol station.

Agent Huerta accordingly stopped the truck and asked the driver, Ms.

- 5 -

Valenzuela, to accompany him to the station; Ms. Valenzuela agreed. Agent Huerta, however, did not allow Ms. Valenzuela to follow him to the station in her own truck. Instead, he took her keys and driver's license, and another agent drove her vehicle to the station. Because no female agents were present to pat down Ms. Valenzuela for weapons, an agent placed her in handcuffs prior to transporting her to the station. Ms. Valenzuela was cooperative with Agent Huerta at all times. Up until the time Ms. Valenzuela agreed to go to the station, Agent Lewis did not inform her that he was going to handcuff her. When Ms. Valenzuela was handcuffed, Agent Huerta observed nothing that made him think she was carrying drugs in her vehicle, possessed a weapon, or was otherwise dangerous or violating the law.

At the border patrol station, Agent Huerta advised Ms. Valenzuela of her Miranda rights, and Ms. Valenzuela signed a form indicating her understanding and waiver of those rights. Agent Christine Britol questioned Valenzuela for about 40 to 45 minutes, during which time Ms. Valenzuela made several incriminating statements. Finally, Ms. Valenzuela invoked her right to an attorney.

After an evidentiary hearing, the district court found that Ms. Valenzuela was arrested at roadside at the time the handcuffs were placed upon her. The parties then submitted supplemental briefs on whether probable cause existed to

arrest Ms. Valenzuela. In a written opinion, the district court then considered and rejected six factors claimed by the government to support probable cause: (1) both the Cadillac and the truck driven by Defendant Valenzuela bore Arizona license plates, (2) Defendant Valenzuela and the driver of the Cadillac drove near each other on two highways close to the border, (3) when Agent Lewis passed Ms. Valenzuela's truck, her left hand was covering her face, (4) after Agent Lewis pulled in behind the Cadillac, Ms. Valenzuela passed the Cadillac rather than remain nearby to render assistance, (5) the Cadillac was covered with dust while the pickup truck was not, and (6) approximately 250 pounds of marijuana were found in the Cadillac. In a nutshell, the district court found that the government simply had not shown a nexus between the Cadillac and the pickup truck at the time of the arrest. No objective evidence supported the government's contention that the Cadillac and the pickup truck were traveling in tandem.

Having lost the probable cause issue, the government then moved for reconsideration of the district court's finding that Ms. Valenzuela was arrested at the time she was handcuffed. The government also requested a supplemental hearing to develop facts as to when Ms. Valenzuela was arrested. The district court rightly viewed the request for another hearing as "a second bite at the apple." Aplt. App. at 104. It denied both requests, reasoning that the issue of when Ms. Valenzuela was arrested was plainly before the court, there having been

two rounds of briefing. Further, the court held that a finding contrary to the original determination would be completely against the evidence developed at the suppression hearing.

Discussion

The government's only argument on appeal is that the border patrol agents had probable cause to arrest Ms. Valenzuela when they took her to the border patrol station for questioning. The government does not challenge the district court's finding that Ms. Valenzuela was arrested when she was handcuffed, nor the district court's denial of the government's request to reopen the matter.

In reviewing a district court's order to suppress evidence, we review the district court's factual findings for clear error, considering the evidence in the light most favorable to the district court's determination. United States v. Rice, 358 F.3d 1268, 1273-74 (10th Cir. 2004). The ultimate determination of whether probable cause to arrest existed is a legal issue that we review de novo. United States v. Edwards, 242 F.3d 928, 933 (10th Cir. 2003).

An arrest is "characterized by highly intrusive or lengthy search or detention," and must therefore be supported by probable cause. Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000); see also Tennessee v. Garner, 471 U.S. 1, 7 (1985). Probable cause to arrest exists only when the "facts and circumstances

within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." Edwards, 242 F.3d at 934; see also Draper v. United States, 358 U.S. 307, 313 (1959). Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion." United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001) (internal quotation marks omitted). The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, 392 U.S. 1 (1968), and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard. Beck v. Ohio, 379 U.S. 89, 96 (1964). The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive. Florida v. Royer, 460 U.S. 491, 507; United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002). Thus, the primary concern is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on

the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002) (internal quotation marks and alterations omitted).

The government argues that "[o]nce Agent Lewis stopped the Cadillac and found 250 pounds of marijuana in the trunk, he had probable cause to believe that the driver of the pickup was acting in concert with the driver of the Cadillac." Aplt. Br. at 13. Significantly, the government does not argue that probable cause arose at any point after Ms. Valenzuela's truck was pulled over. According to the government, there was probable cause to arrest Ms. Valenzuela because (1) "Valenzuela drove in close proximity to the Cadillac for twenty-five miles on two separate highways and through a town where there were many opportunities to turn off the road or stop;" (2) "although the pickup and the Cadillac traded positions and sometimes allowed several vehicles to drive between them, the pickup led the Cadillac through Deming, the most complicated part of the trip;" (3) "both cars had Arizona license plates, which was consistent with Agent Lewis's experience and knowledge of recent alien smuggling cases;" (4) "Reynaga, the driver of the Cadillac[,] was confused and not fluent in English, making it probable that he had followed another driver through Deming, the most complicated part of the trip;" (5) "the pickup was covered with two large American flag decals, which was the sort of highly conspicuous marking typical

of a scout vehicle;" (6) "the Cadillac was covered in a fine layer of dust, consistent with having traveled on a dirt road and being the load vehicle, while the pickup was clean, consistent with being the scout vehicle;" (7) "Valenzuela's hand was covering the left side of her face as Agent Lewis passed her, possibly in an effort to conceal herself from the agent;" and (8) "Valenzuela and Reynaga were traveling within fifty miles of the Mexican border along a route that is often used to smuggle aliens and drugs." Aplt. Br. at 12-13. The government also relies on the fact that Agent Lewis found 250 pounds of marijuana in Mr. Reynaga's trunk.

We hold that the district court correctly evaluated the similar factors before it, and the additional factors now relied upon by the government as supporting probable cause are both waived and without merit. Because the government has pointed out eight specific facts that it argues support probable cause to arrest, we will address these facts in the order presented above. We note, however, that no single factor is determinative, and we view the circumstances in their totality rather than individually. As the government correctly points out, courts may not engage in a "divide-and-conquer" analysis of facts to determine whether probable cause existed. See United States v. Arvizu, 534 U.S. 266, 274 (2002).

However, neither may a court arrive at probable cause simply by piling hunch upon hunch. Thus, in assessing the totality of the circumstances, a

reviewing court "must examine the facts individually in their context to determine whether rational inferences can be drawn from them" that support a probable cause determination. United States v. Martinez-Cigarroa, 44 F.3d 908, 911 (10th Cir. 1995). A factor does not become irrelevant simply because it is "readily susceptible to an innocent explanation." Arvizu, 534 U.S. at 274. Thus, in determining whether probable cause to arrest existed, we look not only to the facts supporting probable cause, but also to those that militate against it. United States v. Johnson, __ F.3d __, No. 03-2153, 2004 WL 811809, at *7 (10th Cir. Apr. 15, 2004).

The government places great weight on the fact that Ms. Valenzuela and Mr. Reynaga were traveling in "close proximity" to each other. However, when we strip away the rhetoric we have only two facts–both vehicles had Arizona plates and both were heading toward Arizona on an Interstate highway. Hardly unusual.

Although other circuits have noted that tandem driving may be indicative of criminal activity in certain circumstances, see United States v. Montero-Camargo, 208 F.3d 1122, 1139 (9th Cir. 2000), we agree with the district court's conclusion that there are insufficient facts to demonstrate that the pickup truck was driving in tandem with the Cadillac. While Agent Lewis followed the two vehicles for approximately 25 miles, he lost contact with both vehicles for at least eight of

- 12 -

those miles. Aplt. App. at 121, 146. When Agent Lewis initially observed the vehicles on Highway 11, two other vehicles separated the Cadillac from Ms. Valenzuela's truck. Id. at 119-20. Moreover, for the approximately seven miles that agent Lewis followed the vehicles on Highway 11, there were cars between the Cadillac and Ms. Valenzuela's truck. Id. at 146.

On Interstate 10, Agent Lewis lost sight of Ms. Valenzuela's truck, but spotted the Cadillac speeding ahead. Once Agent Lewis located both vehicles on the Interstate, the closest he saw them was a distance of a quarter mile. Id. at 147. The truck was traveling in a different lane, separated from the Cadillac by a number of tractor-trailer rigs and other vehicles. Id. at 148. In fact, the only time Agent Lewis ever saw the Cadillac and truck actually travel next to each other, with the Cadillac directly behind the truck, was as both vehicles were clearing the intersection of Pine Street and Gold in Deming–by the entrance of Interstate 10–right before he lost them. Id. at 131-32.

We also find record support for the district court's conclusion that adequate evidence did not support a theory that the truck was the lead (scout) vehicle for the Cadillac. Although Ms. Valenzuela's truck was driving ahead of the Cadillac on Highway 11, that was not the case on the Interstate, where the pickup truck was a quarter mile behind the Cadillac. This undermines any "infer[ence] that the lead car-load car scheme was being used [because] the purported scout car was

actually following, rather than preceding, the lead car." United States v. Barnard, 553 F.2d 389, 392 n.5 (5th Cir. 1977); see also United States v. Escamilla, 560 F.2d 1229, 1234 (5th Cir. 1977) ("the so-called 'scout car' here was behind, rather than in front of, the 'load car', a circumstance . . . which forbids the use of the 'lead car-load car' inference"); United States v. Barragan-Martinez, 504 F.2d 1155, 1157 (9th Cir. 1974). The government understandably attempts to downplay the fact that the pickup truck was lagging far behind the Cadillac, but in considering the totality of the circumstances we must give due weight to it.

Additionally, according to Agent Lewis, lead vehicles usually "scout[] the highway . . . for law enforcement," "run interference," or "try to draw your attention away from the load vehicle" by speeding up or driving erratically. Aplt. App. at 154. Agent Lewis testified that the pickup truck was not speeding, driving too slowly, trying to evade him, or driving improperly in any way. Id. at 140. On the contrary, it was the Cadillac that was speeding on Interstate 10 while the truck was driving at a normal speed. Id. at 158. Indeed, Agent Lewis acknowledged that nothing in the manner the two vehicles were traveling on Interstate 10 led him to believe they were driving in tandem; had he not seen the truck and the Cadillac driving on Highway 11 earlier, he would not have made any association between them. Id. at 148.

The district court also rejected the theory that Ms. Valenzuela's driving

- 14 -

past the Cadillac and Agent Lewis on Interstate 10 after Agent Lewis pulled in behind the Cadillac constitutes evidence of tandem driving that would support probable cause. According to the government, because an innocent person driving in tandem with a vehicle that is pulled over most likely would stop to render assistance, Ms. Valenzuela's failure to render assistance to Mr. Reynaga is inconsistent with legitimate or innocent tandem driving. Had Ms. Valenzuela stopped, that might be evidence of tandem driving. But to argue that her proceeding on her way is evidence of tandem driving (be it legitimate or illegitimate) is preposterous. United States v. Sigmond-Ballesteros, 285 F.3d 1117, 1122 (9th Cir. 2001). As the district court noted, "[t]he much more logical conclusion is that Defendant passed by Agent Lewis and the Cadillac because she was not driving in tandem with the Cadillac." Aplt. App. at 80.

The government also argues that tandem driving was evident because the two vehicles drove "through a town where there were many opportunities to turn off the road or stop," and "the pickup led the Cadillac through Deming, the most complicated part of the trip." Aplt. Br. at 12-13. We take judicial notice that Deming, although a lovely town, is hardly a metropolis, and is on the route to Arizona. Indeed, Agent Lewis acknowledged that Highway 11 to westbound Interstate 10 is the main route to Arizona. Aplt. App. at 133. This is not an instance where two vehicles were traveling on a seldom-used remote road to avoid

detection. Instead, the two cars, close to the Arizona border, were both taking the most direct highway to Arizona amidst the mid-morning traffic.

We also agree with the district court that Arizona license plates on both vehicles (seventy miles away from Arizona) are hardly indicative of illegal activity or tandem driving. See United States v. Martinez-Cigarroa, 44 F.3d 908, 911 (10th Cir. 1995). The government argues that Arizona plates triggered Agent Lewis's knowledge of recent alien smuggling cases. However, no evidence in the district court established how many recent border patrol stops due to illegal smuggling activity involved vehicles with Arizona plates and how many Arizona vehicles on legitimate business are generally found in the area. Thus, this case is remarkably similar to United States v. Monsisvais, 907 F.2d 987, 991 (10th Cir. 1990), where we noted that "[a]lthough Arizona cars must certainly be less common on this stretch of road than those bearing New Mexico plates, we cannot find any basis in the record from which to conclude that Arizona-plated vehicles are any more likely to be transporting aliens near Truth or Consequences than are vehicles bearing the license plates of New Mexico or, for that matter, Texas or Colorado."

The government relies upon United States v. Montero-Camargo, 208 F.3d 1122 (9th Cir. 2000), in arguing the significance of the license plates to smuggling. But that case is readily distinguishable. While the two vehicles in

Montero-Camargo had foreign (Mexicali) license plates, they both turned around in the middle of a highway shortly before a police checkpoint and pulled off the shoulder together, stopping in an area where criminal activity often took place. More importantly, the circumstances in Montero-Camargo–as well as United States v. Arbizo, No. 89-10635, 1991 WL 33102 (9th Cir. Mar. 12, 1991), also cited by the government–only supported reasonable suspicion for a stop, not the more demanding standard of probable cause for an arrest of a driver. Even insofar as establishing reasonable suspicion, the significance of such evidence is far from certain. As the Ninth Circuit stated in limiting the effect of two cars driving in close proximity to each other, such occurrences "may be given some direct weight in the reasonable suspicion analysis. They do not, however, constitute substantial factors. . . ." Montero-Camargo, 208 F.3d at 1139.

In further support of its tandem driving theory, the government argues that Mr. Reynaga's apparent confusion and lack of English fluency make it more probable than not that he followed another driver through Deming, the most complicated part of the trip. First, the government did not assert Mr. Reynaga's confusion and language abilities as a consideration in the probable cause analysis in the district court, see Aplt. App. at 35-36, and the court did not evaluate it for this purpose. We are thus under no obligation to consider it. Thompson v. United States, 223 F.3d 1206, 1211 (10th Cir. 2000). Even if the factor were raised,

however, it is essentially a non sequitur. The government has provided us with no authority tending to show that a driver's confusion upon being stopped or lack of English fluency makes it any more likely that a driver in front of him, or in this case behind him, is committing a crime, and we have found no such authority in our research. We know of no New Mexico or Arizona language requirements for drivers, cf. Maso v. State of N.M. Taxation & Rev. Dept., 85 P.3d 276, 282 (N.M. Ct. App. 2004), and it is simply unremarkable that a driver thirty miles north of the Mexican border would have some difficulty conversing in English. Moreover, the record lacks any evidence suggesting that Mr. Reynaga needed any assistance in his travel, or that the travel through Deming to Interstate 10 was complicated in any way.

The government also argues that the flags displayed on the truck provide a highly conspicuous appearance consistent with a lead vehicle. Again, the government raises this consideration for the first time on appeal, and the district court did not make factual findings supporting this line of argument. The record is silent as to the size or noticeability of these flags, but even if conspicuous, the government's ipse dixit that large American flag decals are the sort of highly conspicuous markings of a scout vehicle strikes us as beyond the pale. In this post-September 11th day and age, it is not at all unusual for drivers to adorn their cars with such symbols of patriotism. See Leslie Linthicum & Lloyd Jojola, An

*Uncommon Year*, Albuquerque Journal, Dec. 30, 2001, at A1.  In reviewing the totality of the circumstances, this fact does not add considerable weight to our probable cause analysis.  Cf. <u>Reid v. Georgia</u>, 448 U.S. 438, 441 (1980) (conduct that "describe[s] a very large category of presumably innocent travelers" is insufficient to constitute a reasonable suspicion).

The government makes much of the fact that "the Cadillac was covered in a fine layer of dust, consistent with having traveled on a dirt road and being the load vehicle, while the pickup was clean, consistent with being the scout vehicle." Aplt. Br. at 13.  According to the government, it is not unusual for a load car to enter the United States from Mexico using dirt roads to avoid the Port of Entry at Columbus, and then meet the lead car, which waits across the border.  Given the dearth of evidence that would support a tandem arrangement, we agree with the district court that this highly overinclusive rule counts for little.  Nothing (other than a hunch) connects the dust on the Cadillac with the lack of dust on the truck. Without at least some more evidence as to the frequency of such dirty car-clean car situations, it appears that the dissimilarity would, if anything, tend to detract from the lead car-load car theory.

The government's argument that Ms. Valenzuela's covering of her face adds to a probable cause determination does not withstand analysis.  In support of this claim, Agent Lewis testified that he observed Ms. Valenzuela leaning her

head on her hand while driving, and leaning her arm on the driver's side door of the truck. Aplt. App. at 134. However, Agent Lewis testified that Ms. Valenzuela was already resting the left side of her face in her left hand when he first saw her, and he never saw her put her hand up to her face in an effort to hide. Id. at 161. In fact, Agent Lewis admitted that based on his observation of Ms. Valenzuela, it was as likely for her to have been relaxing while driving as it was for her to be trying to hide her face. Id. at 134-35. The district court, in interpreting this evidence, found that Ms. Valenzuela "maintained this position as a way to relax while driving." Id. at 80. Because the district court was in the best position to weigh the evidence, we appropriately defer to its findings of fact. Moreover, in undertaking probable cause determinations, we have recognized that "[s]ome facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous." United States v. Lee, 73 F.3d 1034, 1039 (10th Cir. 1996). Ms. Valenzuela's resting of her head in her hand while driving is just such a fact. See United States v. Welker, 689 F.2d 167, 169 (10th Cir. 1982).

The government next urges that the two vehicles were traveling within fifty miles of the Mexican border along a route that is often used to smuggle aliens and drugs. It is true that proximity to the border is a relevant factor in determining whether there is reasonable suspicion to stop a vehicle in the border area. See

United States v. Brignoni-Ponce, 422 U.S. 873, 884-85 (1975). However, because "[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well," the mere fact that the two vehicles were traveling close to the Mexican border does not dispense with the probable cause requirement. Id. at 882. In light of the more demanding standard of probable case, coupled with the government's lack of evidence that Ms. Valenzuela's driving raised any legitimate suspicions of illegal activity, we do not think that this fact adds any significant weight to our analysis, as "mere proximity to the border does not automatically place the citizenry within a deconstitutionalized zone." United States v. Newell, 506 F.2d 401, 405 (5th Cir. 1975) (internal quotation marks omitted).

In light of the above, the presence of marijuana in Mr. Reynaga's vehicle adds little to the probable cause analysis. We have considered the totality of the circumstances known to the border patrol agents, and conclude that the evidence connecting Ms. Valenzuela to the unlawful endeavor in the Cadillac was simply missing when the arrest occurred.

Finally, the government argues that the district court should have deferred to Agent Lewis's expertise in making inferences from these facts. In support of this argument, the government relies on United States v. Gandara-Salinas, 327 F.3d 1127 (10th Cir. 2003). Gandaras-Salinas, however, held only that courts

should accord proper deference "to an officer's ability to distinguish between innocent and suspicious actions." Id. at 1130. It is true that "[i]n reviewing on-the-scene judgments of police officers we must, of course, remember that police officers may well 'draw inferences and make deductions . . . that might well elude an untrained person.'" United States v. Myers, 308 F.3d 251, 255 (3d Cir. 2002) (quoting United States v. Cortez, 449 U.S. 411, 418 (1981)). However, "an officer's inferences and deductions can only justify a warrantless arrest if the government satisfies its burden of establishing the probable cause necessary to support the arrest." Id. Additionally, in making our probable cause determination, we must look at the facts through the scope of a reasonable officer. United States v. Anderson, 981 F.2d 1560, 1566 (10th Cir. 1992). To defer to an officer's interpretation of the facts without applying judgment informed by the Fourth Amendment would eviscerate the need for a judicial determination of probable cause.

The inescapable conclusion to be drawn from the record is that Agents Lewis and Huerta suffered from a lack of communication and failed to fully investigate the facts before arresting Ms. Valenzuela. Agent Lewis testified that he only told Agent Huerta to stop the vehicle and see if he could transport Ms. Valenzuela to the border patrol station. Aplt. App. at 162-63. It is not exactly clear why Agent Huerta felt compelled to handcuff Ms. Valenzuela and put her in

the back of his vehicle, particularly since she had consented to go to the station to answer questions. Moreover, despite his suspicions, Agent Lewis failed to use any available investigative tools to confirm his thoughts. Remarkably, none of the agents ever even asked Mr. Reynaga or Ms. Valenzuela at roadside whether they were traveling together. Careless police work does not justify dispensing with the Fourth Amendment.

AFFIRMED.