2022 CO 38 The People of the State of Colorado, Plaintiff-Appellant v. Lamonte Xavier Smith, Defendant-Appellee No. 22SA58
Supreme Court of Colorado, en banc
June 27, 2022
 Interlocutory Appeal from the District Court Mesa County District Court Case No. 20CR1600 Honorable Valerie J. Robison, Judge 
 Attorneys for Plaintiff-Appellant: 
 Daniel P. Rubinstein, District Attorney, Twenty-First Judicial District 
 George Alan Holley II, Senior Deputy District Attorney 
 Grand Junction, Colorado 
 Attorneys for Defendant-Appellee: 
 Colorado Legal Defense Group 
 Ethan Ice 
 Denver, Colorado 
 JUSTICE SAMOUR delivered the Opinion of the Court, in which CHIEF JUSTICE BOATRIGHT, JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL, JUSTICE HART, and JUSTICE BERKENKOTTER joined. 
 1
 OPINION 
 SAMOUR JUSTICE 
 ¶1 Colorado State Patrol ("CSP") Trooper Christian Bollen had a hunch, and then another hunch, and then another hunch. And he acted on those hunches, despite a circumstance directly undermining them. 
 ¶2 While working interstate interdiction, Trooper Bollen observed a Chevrolet Tahoe with out-of-state license plates. After running the license plate number, he discovered that the car was a rental. Based on the location and direction of travel, the car's rental status, and the out-of-state license plates, he had a hunch that the car might be engaged in the transportation of illegal narcotics. After conducting a traffic stop, he spoke privately with the driver, who informed him that she and her passengers were driving from Los Angeles to Maryland. But her story about the trip wasn't entirely believable. Further, she tried to change the conversation, and when Trooper Bollen told her that he suspected she was "smuggling drugs," she became nervous. He had a hunch that she was involved in drug trafficking. Later, he contacted the three passengers, including the defendant. The information they provided didn't match that disclosed by the driver. And the defendant stared at the glove box when Trooper Bollen asked if there was contraband in the car. Trooper Bollen had a hunch that the passengers were in on the transportation of illegal narcotics. Notwithstanding a dog sniff around the car that resulted in no alert, Trooper Bollen acted on his hunches and searched the Tahoe with another 
 2
 trooper's assistance. They seized a kilogram of cocaine from the glove box and some fentanyl in a prescription bottle. 
 ¶3 In this interlocutory appeal brought by the prosecution, the parties agree that Trooper Bollen performed a lawful traffic stop. The question before us is whether the district court erred in granting the defendant's motion to suppress on the ground that Trooper Bollen lacked probable cause to search the Tahoe. Because probable cause to search is measured against an objective standard of reasonableness and cannot be established by piling hunch upon hunch or by ignoring facts that militate against it, we affirm the district court's order and remand for further proceedings consistent with this opinion. 
 I. Facts and Procedural History 
 ¶4 On the morning of November 20, 2020, Trooper Bollen was sitting in his patrol car at milepost 10 watching eastbound traffic on Interstate 70. Trooper Bollen, an eleven-year veteran with the CSP, had been working in the "smuggling, trafficking, and interdiction" section of the CSP for about two and a half years. He had received more than 300 hours of training in drug interdiction and had investigated over 100 cases involving the transportation of illegal narcotics. 
 ¶5 From his training and experience, Trooper Bollen had learned that out-of- state rental cars are commonly used in drug trafficking and that drug traffickers often engage in "hard travel"-getting from point A to point B as quickly as 
 3
 possible-and then return the cars to the original rental location. Further, he had become familiar with the pattern of drug trafficking on I-70: Drugs are generally transported from west to east, and the proceeds of the sale of drugs are generally transported from east to west. 
 ¶6 At 7:42 a.m., Trooper Bollen observed a black Tahoe driven by a woman. The car had out-of-state license plates (from Florida), so he decided to follow it. When he cleared the license plate number, he discovered that the car was a rental. He had a hunch that the car might be engaged in the transportation of illegal narcotics. Because the car was traveling in the left lane for an extended period of time without passing other cars, he initiated a traffic stop. 
 ¶7 There were four individuals inside the Tahoe: the driver, Erica Sagastizado; the front passenger, Lamonte Xavier Smith (the defendant and Sagastizado's boyfriend); and two rear passengers, Charles Smith (the defendant's brother) and Charles Smith's girlfriend, Trinity Adokomola. Trooper Bollen contacted Sagastizado, explained the reason for the stop, and asked to see her driver's license and the rental car agreement. She handed him her Maryland driver's license and the rental car agreement. As he looked over the documents, he realized that the car had been rented in Los Angeles. Trooper Bollen was aware that Los Angeles is a well-known source of narcotics. He told Sagastizado that he was not going to issue her a citation, but he asked her if she would be willing to go back to his patrol 
 4
 car to talk with him while he ran her information through his agency's database. Sagastizado agreed to do so. Since it was chilly, he asked her if she wanted to sit inside the patrol car, and she took him up on his offer. 
 ¶8 While running Sagastizado's information, Trooper Bollen asked her numerous questions, including how long she'd lived in the Maryland area, where she was coming from, where she was headed, how the passengers knew each other, how everyone got to Los Angeles, when they arrived in Los Angeles, what time they started driving, where they were going next, when they planned to arrive at their destination, and what landmarks they had seen or planned to see. Sagastizado was cooperative. She said that they had flown to Los Angeles from Maryland and were in the process of driving back to Maryland. According to Sagastizado, they had chosen driving as their mode of transportation for their return trip so that they could do some sightseeing. She said that they had left Los Angeles around 6 or 7 p.m. the previous evening and had stopped to see the Grand Canyon. However, she couldn't name any other landmarks they had seen or were planning to see. 
 ¶9 Trooper Bollen told Sagastizado that he'd grown up in the Los Angeles area and visited there regularly, so he was familiar with the route she was on and how long it took to drive from Los Angeles to the location of the stop. He expressed skepticism about the information she'd provided, explaining that there was no 
 5
 way she could have driven from Los Angeles to the Grand Canyon and then to their current location in eleven to twelve hours. Sagastizado responded that they had simply driven past the Grand Canyon and that it was also possible that the canyon they had visited was just a canyon and not the Grand Canyon. She then tried to change the subject, which Trooper Bollen took as an attempt to divert his attention from the details of the trip. 
 ¶10 Other information provided by Sagastizado raised additional red flags. Specifically, she claimed that she needed to be at work in Maryland the next day, which wouldn't have allowed time for sightseeing. And, if getting back to work on time was the goal, flying would have been the optimal method of transportation. Trooper Bollen also noticed that, per the rental agreement, the car was due back in Los Angeles the same day, which left no time for sightseeing and was inconsistent with Sagastizado's statement about returning to Maryland the next day. Moreover, the rental agreement reflected an arrangement Trooper Bollen had become familiar with in his line of work: Drug traffickers generally return rental cars to the original rental location to conceal the destination of the contraband and keep costs down. 
 ¶11 At the end of the conversation, Trooper Bollen told Sagastizado that he rarely gave people tickets and that he was not going to write her one. But he advised her that he was assigned to the smuggling, trafficking, and interdiction 
 6
 task force, which required him to look for people smuggling large amounts of illegal narcotics or currency across the country. He shared with Sagastizado that he "one hundred percent believed" she was "smuggling" contraband in the car. According to Trooper Bollen, Sagastizado went pale and became nervous when she heard this and told him it wasn't true. He asked her if she had a large amount of cash, guns, cocaine, heroin, methamphetamine, or marijuana in the car. She responded that she did not. He then requested permission to search the car, but Sagastizado refused. 
 ¶12 Trooper Bollen mentioned that his partner in the K-9 unit was just down the road and would be there shortly to perform a dog sniff around the car. While waiting for the K-9, Trooper Bollen informed Sagastizado that he worked with federal authorities and offered her an opportunity to work with him and his federal partners. She declined. When he repeated his question about whether there was anything illegal in the car, she again said no. Trooper Bollen told Sagastizado that she could not return to her car yet. As Trooper Bollen walked back to the Tahoe, he had a hunch that Sagastizado had a nefarious motive for her actions: She was involved in the transportation of illegal narcotics. 
 ¶13 At 7:55 a.m., about thirteen minutes after the initial stop, Trooper Bollen spoke with the three passengers in the Tahoe. During this conversation, the defendant mentioned that they had visited his cousin in Los Angeles. He then 
 7
 contradicted Sagastizado by reporting that they had made a stop in Las Vegas (not the Grand Canyon) and that they had opted to travel by car because his brother was scared of flying (not because they wanted to sightsee). One of the passengers at some point asked if they were under arrest. Trooper Bollen explained that nobody was under arrest and that he was just making sure that their story matched Sagastizado's. He shared, however, that he suspected they were "smuggling" illegal narcotics, and he asked them if there was anything illegal in the car-be it guns or large amounts of cash, cocaine, heroin, methamphetamine, or marijuana. According to Trooper Bollen, the defendant appeared to stare at the glove box when he heard this question. The passengers responded that there was nothing illegal in the car. Trooper Bollen requested permission to search the car, but the passengers would not consent to a search. He concluded his interview by informing them that a K-9 unit was on the way to perform a dog sniff around the car. As he returned to his patrol car, Trooper Bollen had a hunch that the Tahoe's passengers were also involved in drug trafficking. 
 ¶14 Trooper Bollen questioned Sagastizado in his patrol car again at 8:02 a.m. Contrary to what the defendant had just told him, Sagastizado denied visiting the defendant's cousin in Los Angeles. She later said that the defendant may have seen his cousin while she remained in the hotel room. Sagastizado eventually told Trooper Bollen that she had to get going because she needed to be at work the next 
 8
 day. After Trooper Bollen discussed how long it would take her to drive to Maryland, Sagastizado asked if she could return to her car. He responded that she could not, but he told her that she was free to step out of the patrol car. 
 ¶15 A few minutes later, at 8:05 a.m., CSP Trooper Jeff Verbas arrived with his K-9, Jedi, who is trained to alert to cocaine, heroin, and methamphetamine, but not to marijuana or fentanyl. Trooper Bollen asked the passengers to exit the Tahoe so that Jedi could sniff around the car. One of the passengers asked if the troopers planned to search the car. Trooper Bollen said that they would only search the car if Jedi alerted to the presence of illegal narcotics. 
 ¶16 At 8:09 a.m., Trooper Verbas conducted a dog sniff by directing Jedi around the Tahoe two times. Jedi did not alert to the presence of illegal narcotics. But Trooper Bollen remained convinced that there was contraband in the car. Thus, notwithstanding the lack of an alert from Jedi, he relied on his hunches and searched the car with Trooper Verbas's assistance. 
 ¶17 Troopers Bollen and Verbas searched the Tahoe at 8:12 a.m. As they conducted their search, the passengers objected, telling the troopers that the search was illegal because it was being conducted without consent. Trooper Bollen told them that he believed he had probable cause to search the car, so he didn't need their consent. 
 9
 ¶18 About five minutes after starting the search, Trooper Bollen asked for the key to the glove compartment. One of the passengers asked if he was under arrest and discussed calling his attorney. Trooper Bollen replied that if he didn't get a key, he would pry open the glove box. One of the passengers then provided the key, and Trooper Bollen unlocked the glove box. Inside he found a kilogram of cocaine.[1] The search also yielded a prescription bottle with Charles Smith's name that contained fentanyl; the prescription on the bottle, however, was not for fentanyl. 
 ¶19 The troopers arrested all four of the Tahoe's occupants. The defendant was subsequently charged with drug offenses related to the cocaine and fentanyl recovered. 
 ¶20 The case proceeded, and the defendant filed a pretrial motion to suppress the evidence found during the search. He argued that his Fourth Amendment rights were violated both because the traffic stop was unreasonably extended and because there was no probable cause for the search. The prosecution opposed the motion. Following an evidentiary hearing, the district court took the matter under advisement. It then issued a well-reasoned order in which it granted the 
 10
 defendant's motion. The court was persuaded by the prosecution that "the traffic stop was not unreasonably prolonged." But the court ruled for the defendant on the second issue, finding that, while Trooper Bollen "had a hunch that illegal substances were hidden in the vehicle," he lacked probable cause to conduct the search. 
 ¶21 The prosecution timely filed this interlocutory appeal pursuant to section 16-12-102(2), C.R.S. (2021), and C.A.R. 4.1(a). 
 II. Jurisdiction 
 ¶22 Our first task is to determine whether we have jurisdiction over this interlocutory appeal. Under section 16-12-102(2) and C.A.R. 4.1(a), the prosecution may file an interlocutory appeal in our court from an order of the district court granting a defendant's pretrial motion to suppress evidence. However, the prosecution may only do so if it certifies to the judge who issued the order and to our court "that the appeal is not taken for the purposes of delay and the evidence is a substantial part of the proof of the charge pending against the defendant." § 16-12-102(2); accord C.A.R. 4.1(a). The defendant does not dispute that the prosecution fulfilled the condition precedent set forth in the statute and the rule. And, based on our review of the record, we conclude that the prosecution indeed did so. We therefore have jurisdiction over this interlocutory appeal. 
 11
 III. Standard of Review 
 ¶23 The next order of business is to set out the standard of review that controls our analysis. Review of a district court's suppression order involves "a mixed question of law and fact." People v. Moreno, 2022 CO 19, ¶ 12, 507 P.3d 1005, 1008 (quoting People v. McIntyre, 2014 CO 39, ¶ 13, 325 P.3d 583, 586). We defer to the district court's findings of fact and do not disturb them if they're supported by sufficient competent evidence in the record. Id. But we review the district court's conclusions of law-that is, determinations regarding the legal effects of its factual findings-de novo. Casillas v. People, 2018 CO 78M, ¶ 18, 427 P.3d 804, 809. 
 IV. Analysis 
 ¶24 Having concluded that we have jurisdiction over this appeal, and mindful of the standard of review that steers our analytical ship, we proceed to navigate the district court's ruling. We ultimately affirm. 
 ¶25 Probable cause is subject to a reasonableness standard and cannot be established by stacking hunch upon hunch. Nor is it proper to disregard facts that militate against a finding of probable cause. Looking at the facts of this case in their totality-i.e., considering not only those supporting probable cause but also those cutting against it-leads us to conclude that Trooper Bollen lacked probable cause to search the Tahoe. 
 12
 A. Relevant Legal Principles 
 ¶26 The Fourth Amendment to the United States Constitution contains two requirements: (1) all searches and seizures must be reasonable; and (2) a warrant may issue only if "probable cause is properly established and the scope of the authorized search is set out with particularity."[2] Kentucky v. King, 563 U.S. 452, 459 (2011). We deal here only with the first requirement. 
 ¶27 A search conducted without a warrant is presumptively unreasonable and thus in contravention of the Fourth Amendment. People v. Allen, 2019 CO 88, ¶ 15, 450 P.3d 724, 728. But "the warrant requirement is subject to certain well-delineated exceptions because the touchstone of the Fourth Amendment is reasonableness." Id. The prosecution shoulders the burden of showing that a warrantless search falls within a recognized exception to the warrant requirement. Id., 450 P.3d at 728-29. One of those exceptions, the automobile exception, "authorizes an officer to perform a search of an automobile if he has 'probable cause to believe that the automobile contains evidence of a crime.'" Id. at ¶ 16, 450 P.3d at 729 (quoting People v. Zuniga, 2016 CO 52, ¶ 14, 372 P.3d 1052, 1056). 
 13
 ¶28 Although the automobile exception requires probable cause, it does not require exigent circumstances. Id. at ¶ 32, 450 P.3d at 731. "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). 
 ¶29 "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." People v. Bailey, 2018 CO 84, ¶ 20, 427 P.3d 821, 827 (quoting Florida v. Harris, 568 U.S. 237, 243 (2013)). "[C]ourts may not engage in a 'divide-and-conquer' analysis of facts" to ascertain whether there was probable cause. United States v. Valenzuela, 365 F.3d 892, 897 (10th Cir. 2004). Rather, in analyzing probable cause, we must consider "the totality of the circumstances." Bailey, ¶ 20, 427 P.3d at 827 (quoting Mendez v. People, 986 P.2d 275, 280 (Colo. 1999)). "[T]he totality of the circumstances test for probable cause is an 'all-things-considered approach' . . . ." Zuniga, ¶ 16, 372 P.3d at 1057 (quoting Harris, 568 U.S. at 1055). 
 ¶30 "The probable cause standard does not lend itself to mathematical certainties and should not be laden with hypertechnical interpretations or rigid legal rules." Bailey, ¶ 21, 427 P.3d at 827 (quoting People v. Altman, 960 P.2d 1164, 1167 (Colo. 1998)). Instead, it calls for "a practical, common-sense decision 
 14
 whether a fair probability exists that a search of a particular place will reveal contraband or evidence of a crime." Id. (quoting Altman, 960 P.2d at 1167). As we have observed, probable cause is "based on factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act." Id. (quoting Mendez, 986 P.2d at 280). 
 ¶31 A fact's worth is not wholly eliminated by "a possible innocent explanation." Zuniga, ¶ 23, 372 P.3d at 1059. Colorado's courts and law enforcement agencies "frequently consider non-criminal and legally ambiguous conduct in probable cause analyses, and the possibility of an innocent justification merely affects a fact's weight and persuasiveness, not its inclusion in the analysis." Id. at ¶ 21, 372 P.3d at 1058. Even lawful circumstances, when considered together, may "lead to a legitimate inference of criminal activity." Bailey, ¶ 22, 427 P.3d at 827 (quoting Altman, 960 P.2d at 1171). Indeed, while certain facts, considered alone, may not amount to probable cause, "those same facts may support a finding of probable cause when considered in combination." Id. (quoting Grassi v. People, 2014 CO 12, ¶ 23, 320 P.3d 332, 338). 
 ¶32 But just as facts that are consistent with innocent behavior or have an innocent connotation may not be disregarded, neither may probable cause be established by ignoring facts that cut against it. Valenzuela, 365 F.3d at 897. Courts 
 15
 must "look not only to the facts supporting probable cause, but also to those that militate against it." Id. 
 ¶33 An officer's hunch is insufficient to establish reasonable suspicion to believe criminal activity may be afoot, United States v. Arvizu, 534 U.S. 266, 273-74 (2002), and reasonable suspicion is a less demanding standard than probable cause, Illinois v. Wardlow, 528 U.S. 119, 123 (2000). Because probable cause is measured against an objective standard of reasonableness, it cannot be established "simply by piling hunch upon hunch." Valenzuela, 365 F.3d at 897. 
 B. Application 
 ¶34 On the date in question, Trooper Bollen had extensive training and experience in drug interdiction. That training and experience, combined with the circumstances present, led Trooper Bollen to have several hunches. 
 ¶35 Trooper Bollen had a hunch that the Tahoe might be transporting illegal narcotics. The car was a rental, had license plates from another state, and was traveling from west to east on I-70. Those details fit the pattern of drug trafficking he had previously observed on I-70. 
 ¶36 Once he spoke with Sagastizado in his patrol car, he had a hunch that she was involved in the transportation of illegal narcotics. First, she had rented the Tahoe in Los Angeles, which he knew was a well-known source of illegal narcotics. Second, her story about the trip wasn't believable. Her statements about visiting 
 16
 the Grand Canyon on the way from Los Angeles, her plans to do more sightseeing, and her supposed need to return to work in Maryland the next day didn't match reality. Third, at some point, she tried to change the conversation, which Trooper Bollen took as an attempt to avoid answering more questions about the trip. And fourth, she became nervous when accused of trafficking drugs. 
 ¶37 After speaking with Sagastizado, Trooper Bollen contacted her cohorts, and his conversation with them gave rise to yet another hunch-they, too, were involved in the transportation of illegal narcotics. First, the information they disclosed was inconsistent with that provided by Sagastizado. And second, the defendant stared at the glove box when Trooper Bollen asked if there was any contraband in the car. 
 ¶38 Trooper Bollen's hunches were certainly justified by the circumstances. But a hunch cannot be equated with probable cause. And in determining that he had probable cause, Trooper Bollen mistakenly piled hunch upon hunch while ignoring Jedi's failure to detect contraband in the car. 
 ¶39 The prosecution nevertheless argues that "nine factors" gave Trooper Bollen probable cause to search. When those factors are stripped to their core, they can be grouped into the four relevant circumstances underlying Trooper Bollen's hunches: (1) the Tahoe was a rental, had out-of-state license plates, and was traveling eastbound on I-70; (2) Sagastizado had rented the Tahoe in Los Angeles; 
 17
 (3) Sagastizado wasn't forthright about the trip and became nervous when Trooper Bollen shared his suspicion about drug trafficking; and (4) the passengers were not forthright about the trip either and the defendant stared at the glove box when Trooper Bollen asked if there was contraband in the car. 
 ¶40 Like the district court, however, we must consider the totality of the circumstances. That requires us to add a fifth circumstance to the mix: Jedi did not alert to the presence of illegal narcotics during the sniff around the car. Trooper Bollen omitted this circumstance from his probable cause consideration, and the prosecution commits the same error in its totality-of-the-circumstances analysis. 
 ¶41 The probable cause standard doesn't consider only those facts that are favorable to law enforcement (i.e., the ones that triggered Trooper Bollen's hunches). It considers instead the totality of the circumstances. As such, we must look not only to the facts supporting probable cause, but also to those militating against it. 
 ¶42 We conclude that the facts, considered together, did not establish a fair probability that a search of the Tahoe would reveal contraband or evidence of a crime. Therefore, while Trooper Bollen had hunch, upon hunch, upon hunch that illegal substances were concealed in the Tahoe, he lacked probable cause to conduct the challenged search. 
 18
 V. Conclusion 
 ¶43 Because the district court correctly resolved the defendant's motion to suppress, we affirm and remand for further proceedings consistent with this opinion. 
 19
 --------- 
 Notes: 
 [1] The cocaine's packaging apparently contained mineral oil, which, according to Trooper Verbas, acted as a masking agent and threw off Jedi's scent. 
 [2] Our state's Fourth Amendment counterpart also prohibits (1) unreasonable searches and seizures and (2) search warrants that either fail to establish probable cause or lack particularity. Colo. Const. art. 2, § 7. Because the ruling under challenge relied exclusively on Fourth Amendment jurisprudence, we limit our analysis accordingly. 
 ---------