JUSTICE SAMOUR delivered the Opinion of the Court.
¶ 1 The People seek interlocutory review of the trial court's pretrial order granting defendant Edwin Bailey's motion to suppress evidence gathered during a search of his car. The trial court found that placing Mason, a certified narcotics-detecting dog, in Bailey's car was a search that was not supported by probable cause. We now reverse the trial court's suppression order. We hold that the totality of the circumstances, including Mason's alert to the odor of narcotics while sniffing the exterior of Bailey's car, provided state troopers with probable cause to search the car. The fact that Mason's alert was not a final indication did not render it irrelevant to the troopers' probable cause determination.
I. Factual and Procedural History
¶ 2 On December 7, 2017, as Bailey was standing next to his Toyota Yaris at a gas pump in a gas station off Interstate 70 in Fruita, Colorado, State Patrol Trooper Leonard Fleckenstein pulled into the gas station in his marked SUV to refuel. Trooper Fleckenstein noticed that Bailey was not pumping gas and that his Yaris had Iowa license plates.[1] After running the license plate number, the trooper learned that the car was registered to a female, Carol Johnson. But he did not see any women or anyone else in the car. He then watched as Bailey went into the gas station's store, returned to his car, moved the car and parked it near the store's front door, walked back into the store, exited again, and then sat in his car.
¶ 3 Trooper Fleckenstein subsequently noticed that Bailey was watching him frequently in his car's mirrors. The trooper decided to move his SUV to the east side of the gas station where he continued to keep an eye on Bailey. At that point, Bailey got out of his car again, went into the store a third time, and returned to his car, where he continued watching Trooper Fleckenstein in his car's *824 mirrors. Trooper Fleckenstein concluded that these actions were not "normal for a citizen going about his business." He therefore called Trooper Kelly Pickering, explained the situation, and requested that Trooper Pickering meet him at the gas station.
¶ 4 Bailey was still sitting in his Yaris when Trooper Pickering arrived, approximately twenty minutes after Trooper Fleckenstein moved his SUV to the east side of the gas station's parking lot. The troopers decided to drive across the street to a hotel parking lot, where they would be out of Bailey's sight. A few minutes later, Bailey backed out of his parking space and moved his car to the east side of the gas station's parking lot. This prompted Troopers Fleckenstein and Pickering to return to the gas station and contact Bailey.
¶ 5 As the troopers walked up to Bailey's car, Bailey rolled down his window. An overwhelming odor of air fresheners or cologne exuded from inside Bailey's car-a tactic Trooper Pickering had seen some narcotic traffickers employ to mask the odor of narcotics. Bailey could not provide proof of insurance, but he gave Trooper Fleckenstein his Iowa driver's license and the vehicle's registration card. Trooper Fleckenstein ran Bailey's license and learned he had an outstanding, nonextraditable arrest warrant out of California for possession of a concealed weapon. Meanwhile, Trooper Pickering called Johnson, the registered owner of the car, who told him that Bailey had permission to drive the Yaris. Johnson then texted Pickering the car's insurance information.
¶ 6 While standing next to the Yaris, Trooper Fleckenstein noticed that Bailey was nervous and that "his hands were shaking badly." He asked Bailey where he had driven his vehicle. Bailey told him that he was returning from a clothing convention in Las Vegas, where he'd hoped to purchase some machines. When asked if he made any contacts there, Bailey answered in the affirmative, but he could not show the trooper any business cards from vendors or anyone else at the convention. As he discussed the purpose of his trip, Bailey provided seemingly inconsistent information about his line of work and could not show the trooper any documentation of his accommodations in Las Vegas. Trooper Fleckenstein then asked Bailey when he left Iowa for the convention, and Bailey stated that he started driving three days earlier, on December 4. That seemed like a very short trip to the trooper because he estimated that the distance between Iowa and Las Vegas is about 1600 miles:
[A] person leaving on the fourth from Iowa, even driving straight through[,] you wouldn't get there clear 'til the next day, which would be the fifth; and that's without stopping at all, which would be an over 24-hour [period] driving straight. And to [attend] a convention, stay overnight, and then already be back in Colorado on-in the morning on the seventh was almost impossible.
¶ 7 During his conversation with Trooper Fleckenstein, Bailey confirmed that everything in the car was his and that he had been in possession of the car the entire time he was in Las Vegas. At that point, Bailey became more nervous and started stumbling over his words. He told Trooper Fleckenstein that he was not going to talk anymore and rolled up his window.
¶ 8 Bailey was free to leave, but he could not drive away because his car's battery was dead. As the troopers were in the process of determining how to assist Bailey, Trooper Shane Gosnell arrived with Mason, a certified narcotics-detecting dog.[2] Trooper Fleckenstein had asked Trooper Gosnell earlier to respond with Mason. Though he had a narcotics-detecting dog himself, Trooper Fleckenstein requested Mason because, unlike Trooper Fleckenstein's dog, Mason is not trained to alert to the odor of marijuana, the possession of which is not unlawful in Colorado under certain circumstances.[3] Shortly after *825 arriving, Trooper Gosnell retrieved a battery pack from his vehicle, but Trooper Fleckenstein asked him to deploy Mason before jump-starting Bailey's car. Trooper Gosnell obliged.
¶ 9 When deploying Mason in relation to a vehicle, Trooper Gosnell conducts "two passes" around the exterior of the vehicle. During the "first pass," Mason is moved at a "smooth" but "decent pace," giving him "the opportunity [to] basically smell the air around the exterior" of the vehicle. The "second pass" is a more detailed pass that focuses on gaps in the vehicle "where the odor may be traveling out [to] the exterior of the vehicle."
¶ 10 As Mason completed the first pass around Bailey's car, Trooper Gosnell made the following observations:
We got to about the driver's side door and [Mason] did what we call head turn or head snap, where he immediately turned back and went back across the same path in which we had just crossed. It's behavior consistent with them coming into odor, and they're trying to go back to see at what point they came into that odor. He went back towards the front of the vehicle, stood up on the front bumper, and his breathing changed. It was more rapid and smaller breaths; [he was] taking in air quicker and at a faster rate so that [he] can try to find exactly at what point along the vehicle [he] ... [came] into that odor. He then went under the vehicle, which is also indicative of being in the presence of the odor of narcotics. A dog ... generally won't crawl under a vehicle like that. And in my training and experience it's unless they're in the odor of narcotics, specifically Mason.
According to Trooper Gosnell, "because of the alert or the change in behavior" while completing the first pass, he placed Mason in Bailey's vehicle during the second pass so that Mason could try to locate the source of the odor of narcotics detected. Consistent with his training, Mason searched the vehicle; however, he did not identify the specific location of the source of the narcotics odor. Trooper Gosnell next popped the trunk of the car, and Mason sniffed inside the trunk. After searching the trunk, again without identifying the specific location of the source of the narcotics odor, Trooper Gosnell took Mason around the passenger side of the car, at which point Mason "gave a final indication ... that he was getting odor" from the passenger side front door seam by putting his nose on and staring at that seam.
¶ 11 The troopers then searched Bailey's car by hand. They found a box in the trunk that contained six separate vacuum-sealed packages of marijuana weighing a total of 6.88 pounds. Further, they discovered a white powdery substance in the trunk and in the passenger side of the car. Two bottles of cologne and numerous air fresheners were also recovered from the car.
¶ 12 Bailey was subsequently charged with multiple offenses related to the possession and distribution of marijuana. Before trial, Bailey filed a motion seeking to suppress any evidence obtained as a result of the search of his car. He argued that "placing K-9 Mason in [his] vehicle exceeded the bounds of a dog sniff [ ] and intruded into a constitutionally protected space." Because Bailey believed the troopers lacked probable cause to justify this warrantless intrusion, he urged the trial court to exclude, as "fruits of [an] unconstitutional search," the evidence subsequently recovered from his car during the troopers' hand search.
¶ 13 Troopers Fleckenstein, Pickering, and Gosnell all testified at the hearing held on Bailey's motion to suppress. Following the hearing, the trial court reviewed video footage of Mason's deployment and issued a written order. The court agreed with Bailey that the troopers violated his constitutional right to be free from unreasonable searches and seizures when they placed Mason in his car. More specifically, the court found that (1) Troopers Fleckenstein and Pickering "did not believe that they had probable cause" to search Bailey's car, and that this was part of the reason they decided to have Mason conduct a sniff on the exterior of the car; and (2) "[a]lthough walking Mason around the car was not a violation of [Bailey's] Fourth Amendment rights, opening the door and *826 popping the trunk of Bailey's car and putting a K-9 dog inside [was] a search of Bailey's property," which was "not supported by probable cause." The court, therefore, suppressed the evidence subsequently seized during the troopers' hand search of Bailey's car.
¶ 14 The People filed a motion to reconsider, but the motion was denied. The trial court acknowledged that, before being placed in Bailey's car, "Mason can be seen [in the video recording] jumping up on the left front of the car and moving around." However, it determined that because this change in behavior was not a "final" indication, it did not provide probable cause to search the car. The court reasoned that no probable cause existed until there was a final indication on the passenger side front door seam, which "did not occur until after [Trooper Gosnell] had put Mason inside the car."[4]
¶ 15 The People then brought this interlocutory appeal, pursuant to section 16-12-102(2), C.R.S. (2018), and C.A.R. 4.1(a). Both the statute and the rule allow the People to file an interlocutory appeal in this court from a district court's ruling granting a motion to suppress evidence.
II. Analysis
¶ 16 The People argue that the trial court erred in applying the law. We agree. We hold that the totality of the circumstances, including Mason's alert while sniffing the exterior of Bailey's car, provided the troopers probable cause to believe that the car contained narcotics. The fact that Mason's alert was not a final indication did not render it irrelevant to the troopers' probable cause determination. Therefore, we reverse the trial court's order granting Bailey's motion to suppress the evidence subsequently found during the troopers' hand search of the car.[5]
A. Standard of Review
¶ 17 Review of a trial court's order addressing a defendant's motion to suppress presents "a mixed question of law and fact." People v. Gothard , 185 P.3d 180, 183 (Colo. 2008). We defer to the trial court's factual findings and do not disturb them "if they are supported by competent evidence in the record." People v. Castaneda , 249 P.3d 1119, 1122 (Colo. 2011). However, "the trial court's legal conclusions are subject to de novo review." People v. Pitts , 13 P.3d 1218, 1222 (Colo. 2000).
B. Relevant Law
¶ 18 The Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit unreasonable searches and seizures. Mendez v. People , 986 P.2d 275, 279 (Colo. 1999). Neither constitutional provision delineates when a police officer must obtain a warrant before conducting a search, but the United States Supreme Court has inferred from the text of the Fourth Amendment that "a warrant must generally be secured." Kentucky v. King , 563 U.S. 452, 459, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011). Consequently, "[a] warrantless search is presumptively unreasonable and therefore unconstitutional ...." People v. Zuniga , 2016 CO 52, ¶ 14, 372 P.3d 1052, 1056. "To overcome this presumption, the prosecution has the burden of establishing that the warrantless search is supported by probable cause and is justified under one of the narrowly defined exceptions to the warrant requirement." People v. Winpigler , 8 P.3d 439, 443 (Colo. 1999). One such exception is the automobile exception, which "allows police officers to conduct a warrantless search of an automobile if they have probable cause to believe that the automobile contains evidence of a crime." Zuniga , ¶ 14, 372 P.3d at 1056 (quoting People v. Hill , 929 P.2d 735, 739 (Colo. 1996) ).
*827 ¶ 19 Because the parties agree that the automobile exception applies here, the question we must address is whether the troopers had probable cause to believe that Bailey's car contained contraband or evidence of a crime to justify the warrantless search conducted. We have discussed on numerous occasions the central tenets underlying the concept of probable cause. We take a moment to do so again here.
¶ 20 "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." Florida v. Harris , 568 U.S. 237, 243, 133 S.Ct. 1050, 185 L.Ed.2d 61 (2013) (internal quotation marks and alterations omitted) (citing Texas v. Brown , 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983) (plurality opinion) ). Under both the federal and state constitutions, when we analyze probable cause, we must consider "the totality of the circumstances." Mendez , 986 P.2d at 280. As police officers determine whether probable cause exists, they "may use their judgment, experience, and training in evaluating the circumstances and assessing the combined importance of the individual facts." People v. Schall , 59 P.3d 848, 852 (Colo. 2002).
¶ 21 "The probable cause standard does not lend itself to mathematical certainties and should not be laden with hypertechnical interpretations or rigid legal rules." People v. Altman , 960 P.2d 1164, 1167 (Colo. 1998). Instead, in considering all of the circumstances present, we are required to "make a practical, common-sense decision whether a fair probability exists that a search of a particular place will reveal contraband or evidence of a crime." Id. ; see also Harris , 568 U.S. at 244, 133 S.Ct. 1050 (in explaining probable cause, "[w]e have rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible ... approach"). Thus, a fair probability does not refer to a "mathematical probability"; "[r]ather, probable cause must be equated with reasonable grounds." People v. Pate , 705 P.2d 519, 521-22 (Colo. 1985). As such, a probable cause determination is "based on factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act." Mendez , 986 P.2d at 280 ; see also Illinois v. Gates , 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ("[P]robable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts-not readily, or even usefully, reduced to a neat set of legal rules.").
¶ 22 Because the totality of the circumstances standard is an "all-things-considered approach," Harris , 568 U.S. at 244, 133 S.Ct. 1050, the circumstances present must be viewed together, not in isolation, Grassi v. People , 2014 CO 12, ¶ 23, 320 P.3d 332, 338. While certain facts, considered singly, may be insufficient to establish probable cause, "those same facts may support a finding of probable cause when considered in combination." Grassi , ¶ 23, 320 P.3d at 338. Even lawful circumstances, when considered in conjunction with one another, "may well lead to a legitimate inference of criminal activity." Altman , 960 P.2d at 1171 ; see also Gates , 462 U.S. at 243 n.13, 103 S.Ct. 2317 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to sub silentio impose a drastically more rigorous definition of probable cause than the security of our citizens demands.").
¶ 23 With these principles in mind, we proceed to review the search challenged by Bailey. We focus on whether the totality of the circumstances provided the troopers probable cause to believe that contraband or evidence of a crime would be found in his car.
C. Application
¶ 24 At the outset, we note that Bailey does not contend that having Mason sniff around the outside of his car constituted a constitutionally protected search. On the other hand, the People do not dispute that placing Mason in his car was a search subject to protection under the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution. The only question before us is whether the trial court erred in finding that placing Mason in *828 the car was an unconstitutional search because it lacked probable cause.
¶ 25 Trooper Gosnell testified that Mason alerted to the odor of narcotics during the first pass around Bailey's car. According to the trooper, Mason did so by changing his behavior: he did a "head turn or head snap" when he sniffed the area outside the driver's side door, went back toward the front of the car by following the path he had just taken, stood up on the front bumper, started breathing faster, and went under the car. The video footage of Mason's deployment corroborates this testimony.
¶ 26 Significantly, the trial court did not find any of the testimony provided by Trooper Gosnell or the other troopers unreliable or inconsistent with the video recording; nor did the trial court question the general credibility of any of the troopers. Instead, the trial court disregarded the evidence related to Mason's initial alert because it was not a "final" indication of the odor of narcotics. We are not aware of any authority that supports this proposition, and neither the trial court nor Bailey cited any.
¶ 27 The decision in United States v. Moore , 795 F.3d 1224 (10th Cir. 2015), is informative. There, a trooper testified that during the first pass around Moore's car, Jester, a certified narcotics-detecting dog, " 'gave a positive alert' with 'a really good change of behavior' " as he "snapped his head around, returned to the front of Moore's vehicle, and jumped through the driver's side window, which Moore had left open." Id. at 1231, 1227. The United States Court of Appeals for the Tenth Circuit found that, "as soon as Jester alerted outside Moore's vehicle, the troopers had probable cause to search it." Id. at 1232. Significantly, the court determined that "the fact that Jester gave an 'alert' and not his trained 'indication' [did] not change this result." Id. Rather, explained the court, "an alert, or a change in a dog's behavior in reaction to the odor of drugs, is sufficient to establish probable cause to search a vehicle." Id. Thus, the court concluded that a final indication was not required. Id.
¶ 28 Just as Jester "did not provide his final indication by sitting and staring at the source of the odor" before entering Moore's car, id. , here, Mason did not provide a final indication by pointing his nose and staring at the source of the odor before he was placed in Bailey's car. But, like Jester, Mason gave an alert to the odor of narcotics during his first pass around the car. In fact, Mason's change in behavior was similar to Jester's: Mason snapped his head back and returned to the front of the car.
¶ 29 Bailey argues that Moore is inapposite because "the record supports the district court's finding that Mason went into the car before he alerted." Bailey misunderstands the trial court's order. The trial court did not find that Mason failed to alert before he was placed in Bailey's car. Rather, the trial court found that, although Mason alerted during his first pass around the car, that alert was irrelevant to the probable cause determination because it was not Mason's final indication.[6]
¶ 30 In any event, while we find Moore 's rationale persuasive, our analysis is not tethered to that decision. We conclude that Mason's initial alert, when considered in conjunction with other circumstances present, provided the troopers probable cause to believe that there were narcotics in Bailey's car. In other words, consistent with our probable cause jurisprudence, our determination is rooted in the totality of the circumstances.
¶ 31 Here, before placing Mason in Bailey's car, the troopers were aware of the following circumstances:
• Bailey was in a gas station off an interstate highway that Trooper Fleckenstein recognized as a corridor for interstate drug trafficking, and the Yaris had out-of-state license plates;
*829 • Bailey engaged in erratic behavior by visiting the gas station's store three separate times, sitting in his car for an extended period of time while parked in front of the store, constantly watching Trooper Fleckenstein in his car's mirrors, and moving his car to the east side of the gas station a few minutes after Troopers Fleckenstein and Pickering drove to the hotel parking lot across the street out of his sight;
• when Bailey rolled down his window to speak with Trooper Fleckenstein, there was an overwhelming odor of air fresheners or cologne coming from inside Bailey's car, and Trooper Pickering was aware that individuals engaged in trafficking narcotics sometimes use air fresheners or cologne to mask the odor of the narcotics;
• as Trooper Fleckenstein stood next to the Yaris, he noticed that Bailey was nervous and that his hands were shaking badly;
• after Bailey confirmed that everything in the car was his and that he had been in possession of the car at all times in Las Vegas, he became more nervous and started stumbling over his words;
• Bailey provided seemingly inconsistent information about his line of work and had no documentation to support his statements about the purpose of his trip or his accommodations in Las Vegas;
• Trooper Fleckenstein believed it was almost impossible for Bailey to have traveled from Iowa to Las Vegas and then to Colorado between December 4 and December 7; and
• during his first pass around Bailey's car, Mason alerted to the smell of narcotics by changing his behavior.
¶ 32 We acknowledge that some of these circumstances, considered in isolation, would be insufficient to provide the basis for probable cause. Indeed, the troopers did not notice any unlawful behavior while observing Bailey. But when the circumstances are considered in conjunction with one another, it is clear that they afforded the troopers a legitimate inference of criminal activity. It is the totality of the circumstances that established a fair probability that there were narcotics in Bailey's car.
¶ 33 The trial court considered some, but not all, of the circumstances present. In particular, the trial court dismissed Mason's alert during his first pass around Bailey's car because it was not a final indication. We conclude that the trial court erred in doing so. The "all-things-considered" standard required the trial court to consider all the circumstances together. Because the totality of the circumstances established reasonable grounds to believe Bailey's car contained narcotics, the troopers had probable cause to search it when they placed Mason inside.
III. Conclusion
¶ 34 We conclude that the trial court erred in finding that the troopers violated Bailey's constitutional right to be free from unreasonable searches and seizures. When the troopers placed Mason in Bailey's car, they had probable cause to believe that there were narcotics in Bailey's car. Hence, we reverse the trial court's order suppressing the evidence subsequently collected during the troopers' hand search of the car, and remand the case for further proceedings.

Trooper Fleckenstein's duties include patrolling interstate highways in general and drug interdiction in particular. He has received training related to the distribution of controlled substances via the interstate highway system. This training includes working with a certified narcotics-detecting dog. Trooper Fleckenstein testified that Interstate 70 is a common corridor for the movement of controlled substances.

Trooper Gosnell and Mason are certified by the Colorado Police Canine Association. Mason is trained and certified to detect methamphetamine, cocaine, heroin, and MDMA ecstasy.

Pursuant to Colo. Const. art. XVIII, § 16 (3)(a) (Amendment 64), titled "Personal use of marijuana," the possession, use, display, purchase, or transport of "one ounce or less of marijuana" is not "unlawful" and is not "an offense under Colorado law or the law of any locality within Colorado ... for persons twenty-one years of age or older."

The court also recognized in the order denying the motion to reconsider "that the troopers' subjective beliefs about whether they had probable cause is not relevant."

In light of our holding, we do not address the People's alternative argument that, even if the troopers lacked probable cause to place Mason in Bailey's car, the evidence subsequently collected during the troopers' hand search of the car, which occurred after Mason's final indication, does not constitute fruit of the poisonous tree.

To the extent the trial court's ruling can be read as Bailey suggests, we would still reverse because the ruling would then be based on a factual finding that is unsupported by the record. Given the evidence presented at the suppression hearing, and given further that the trial court did not find any of the troopers' testimony unreliable, incredible, or inconsistent with the video recording, a finding that Mason did not alert before being placed in the car would constitute an abuse of discretion.