Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's
homepage at http://www.courts.state.co.us.  Opinions are also
posted on the Colorado Bar Association's homepage at
http://www.cobar.org.

ADVANCE SHEET HEADNOTE
October 28, 2019

**2019 CO 88**

**No. 19SA142, *People v. Allen*—Inventory Search—Protective Search for Weapons—Automobile Exception.**

The supreme court concludes that the inventory search of the defendant's car violated the Fourth Amendment's prohibition against unreasonable searches and seizures because there is no evidence that officers decided to impound the car pursuant to any written or oral standardized criteria or policies.  Further, the court rules that the People did not establish that the search fell within the protective search exception to the warrant requirement or within that requirement's automobile exception.  Therefore, the court affirms the district court's suppression order.

# The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

_____

## 2019 CO 88

_____

**Supreme Court Case No. 19SA142**
*Interlocutory Appeal from the District Court*
Weld County District Court Case No. 18CR1024
Honorable Marcelo A. Kopcow

_____

**Plaintiff-Appellant:**

The People of the State of Colorado,

v.

**Defendant-Appellee:**

Billie Thomas Allen.

_____

**Order Affirmed**
*en banc*
October 28, 2019

_____

**Attorneys for Plaintiff-Appellant:**
Clifford E. Riedel, District Attorney, Eighth Judicial District
David P. Vandenberg, Chief Deputy District Attorney
    *Fort Collins, Colorado*

**Attorneys for Defendant-Appellee:**
Houtchens, Greenfield, Sedlak & Zacheis, LLC
Melanie A. Sedlak
    *Greeley, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.

¶1 Following a traffic stop of a Cadillac driven by Billie Thomas Allen, Greeley Police Department officers conducted an inventory search that yielded a handgun and methamphetamine. In this interlocutory appeal brought by the People, we must determine whether the district court erred in granting Allen's pretrial request to suppress those items. The People argue that no constitutional violation occurred when the Cadillac was seized and inventoried because the officers properly exercised their discretion in deciding to impound it. Alternatively, the People maintain that the officers were authorized to conduct either a protective search for weapons or a search pursuant to the automobile exception to the warrant requirement. Whether the officers had probable cause to search the Cadillac, as required by the automobile exception, is a close question, but one we ultimately conclude the district court resolved correctly. And, because we also agree with the district court that neither the protective search exception nor the inventory search exception can justify the challenged search, we affirm.

## I. Facts and Procedural History

¶2 While working patrol at approximately 2:30 in the morning, Officer Randall Snyder observed a Cadillac with two occupants fail to stop at a posted stop sign in Greeley, Colorado. The Cadillac stopped, but not until after passing the stop sign and entering the intersection of 6th Avenue and 8th Street. Shortly after the Cadillac took a right-hand turn on 8th Street, Officer Snyder activated his

2

emergency lights to initiate a traffic stop. But the Cadillac did not yield immediately and continued westbound on 8th Street toward 7th Avenue. When the Cadillac reached 7th Avenue, it turned into the parking lot of the Clarion Hotel.

¶3 Once in the parking lot, the Cadillac moved at a slow speed for a distance of about a city block. Because the passenger in the Cadillac ducked his head several times to possibly hide something under his seat, Officer Snyder radioed for assistance. As the Cadillac reached the north end of the parking lot, it made a left-hand turn, which was quickly followed by a sharp right-hand turn into an empty parking space. When the Cadillac started to back out, apparently because it was not parked straight and was sticking out of the parking space a few feet, Officer Snyder sounded his siren a couple of times to make sure the Cadillac didn't hit his patrol car. The Cadillac then came to a complete stop—Officer Snyder estimated that this was approximately a minute after he first turned on his emergency equipment.

¶4 Officer Steven Vaughn arrived a short while later in response to Officer Snyder's call for assistance. The two officers approached the Cadillac on foot—Officer Snyder on the driver's side and Officer Vaughn on the passenger's side. The driver, Allen, provided Officer Snyder a Colorado driver's license but could not produce the vehicle's registration or proof of insurance. Allen indicated that he was in the process of buying the Cadillac from a Cañon City resident, Klarissa

3

Swift, and that he was self-insured. But he couldn't provide documentation to support either claim.

¶5     The passenger in the Cadillac identified himself as Robert Cross. That name was familiar to Officer Snyder because he had been told by other officers during the preceding days or weeks that Cross was possibly carrying a handgun and dealing methamphetamine. Officer Snyder conveyed this information, along with his earlier observation of Cross's furtive movements, to Officer Vaughn, and Officer Vaughn, in turn, asked Cross to exit the vehicle so he could pat him down for weapons. Finding no weapons on Cross's person, Officer Vaughn proceeded to perform a protective search for weapons in the area around the front passenger seat. Under that seat, he discovered a live bullet.

¶6     While Officer Vaughn remained with the Cadillac, Officer Snyder returned to his patrol car and ran the Cadillac's license plate number and Allen's driver's license. He confirmed that the vehicle was registered to Swift in Cañon City and learned that Allen had a valid driver's license and did not have any outstanding warrants.

¶7     Upon returning to the Cadillac, Officer Snyder asked Allen if he would mind stepping out of the vehicle so they could speak, and Allen agreed to do so. Allen was not handcuffed, no weapons were drawn, and no force was used. And Officer Snyder employed a professional and non-aggressive tone and demeanor.

4

After patting Allen down for weapons and finding none, Officer Snyder asked him how he knew Cross and what he was doing in Greeley (since Allen's driver's license showed he lived in Cañon City). Allen responded that he was visiting Cross because they were old friends. Officer Snyder then asked Allen why he failed to immediately pull over when the patrol car's emergency lights were activated. Allen replied that he was staying at the Clarion Hotel and thought it would be safer to pull into the hotel's parking lot. When Officer Snyder inquired about Cross's furtive movements, Allen did not provide a direct response. Finally, Officer Snyder asked Allen whether there were any guns or illegal drugs in the Cadillac, and Allen said that he was not allowed to own a gun because he was a convicted felon.

¶8 As Officer Snyder was wrapping up his interview of Allen, Cross asked if he could leave and go into the hotel, and the officers allowed him to do so. Officer Snyder then told Allen that he would receive a traffic citation for failing to stop at the stop sign and for failing to provide proof of insurance. He also advised Allen that the Cadillac would be impounded due to the lack of registration and proof of insurance. While Officer Snyder filled out the necessary paperwork, Allen was allowed to return to the Cadillac and retrieve some of his property. Once he received the traffic citation, Allen was told he was free to leave. He left and walked into the hotel.

5

¶9 Before towing the Cadillac, the officers inventoried its contents. Under the floormat on the driver's floorboard, they located a black semiautomatic handgun. At that point, Officer Vaughn and Sergeant Daniel Frazen, who had just arrived, went looking for Allen in the hotel. With the assistance of the front desk, they eventually spotted him walking on a sidewalk outside the hotel with a woman and arrested him without incident. Meanwhile, Officer Snyder continued the inventory search of the Cadillac. In the center console, he found a bag with methamphetamine and U.S. currency.

¶10 Allen was subsequently charged with multiple crimes, including possession of a weapon by a previous offender and possession of a controlled substance. Before trial, he requested, among other things, that the evidence collected from the Cadillac be suppressed as having been obtained illegally. The People filed a response, arguing that the officers were justified in seizing and inventorying the Cadillac before impounding it. In the alternative, they asserted that the officers were authorized to conduct either a protective search for weapons or a search pursuant to the automobile exception. The district court rejected all three of the People's contentions and suppressed the handgun and methamphetamine.[1]

---

[1] The district court suppressed "[e]vidence of the firearm and controlled substance located in the Cadillac." It did not mention the U.S. currency recovered.

6

¶11    The People then brought this interlocutory appeal.

## II.  Jurisdiction

¶12    In limited circumstances, the People may lodge an interlocutory appeal of a district court's order.  As relevant here, section 16-12-102(2), C.R.S. (2019), and C.A.R. 4.1(a) authorize the People to do so when a district court grants a defendant's motion to suppress evidence and they certify both that the appeal is not taken for purposes of delay and that the evidence is a substantial part of the proof of the charges pending against the defendant.  We conclude that the People have met these threshold requirements here.

## III.  Standard of Review

¶13    We have made clear that review of a district court's order regarding a defendant's motion to suppress involves "a mixed question of law and fact." *People v. Threlkel*, 2019 CO 18, ¶ 15, 438 P.3d 722, 727 (quoting *People v. Gothard*, 185 P.3d 180, 183 (Colo. 2008)).  We defer to the district court's factual findings and do not disturb them if they are supported by competent evidence in the record.  *Id.* But we review de novo the district court's legal conclusions.  *Id.*

## IV.  Analysis

¶14    In urging us to reverse the order suppressing the handgun and methamphetamine, the People renew the claims they advanced in front of the

7

district court. We address each in turn after setting forth some pertinent general principles of law related to searches and seizures.

## A. Pertinent General Principles of Law

¶15 Both the Fourth Amendment to the United States Constitution and article II, section 7 of the Colorado Constitution prohibit unreasonable searches and seizures. *People v. Bailey*, 2018 CO 84, ¶ 18, 427 P.3d 821, 826. While neither provision spells out when a police officer is required to obtain a warrant in order to conduct a reasonable and constitutional search and seizure, the Supreme Court has inferred from the text of the Fourth Amendment that "a warrant must generally be secured."[2] *Kentucky v. King*, 563 U.S. 452, 459 (2011). There is a presumption that a warrantless search is unreasonable and thus unconstitutional. *People v. Zuniga*, 2016 CO 52, ¶ 14, 372 P.3d 1052, 1056. Nevertheless, the warrant requirement is subject to certain well-delineated exceptions because the touchstone of the Fourth Amendment is reasonableness. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The prosecution bears the burden of establishing that a warrantless search falls within one of the exceptions to the warrant requirement. *People v. Pate*, 71 P.3d 1005, 1010 (Colo. 2003).

---

[2] The rulings under challenge relied exclusively on Fourth Amendment jurisprudence. We limit our analysis accordingly.

¶16    One such exception allows an officer to seize a vehicle and inventory its contents in furtherance of community caretaking functions. *People v. Brown*, 2018 CO 27, ¶ 8, 415 P.3d 815, 817–18. Another permits an officer who has an articulable and objectively reasonable belief that a motorist is armed and dangerous to conduct a protective search for weapons (hereinafter "protective search") in the vehicle's passenger compartment. *People v. Delacruz*, 2016 CO 76, ¶ 14, 384 P.3d 349, 352–53. Yet another, known as the automobile exception, authorizes an officer to perform a search of an automobile if he has "probable cause to believe that the automobile contains evidence of a crime." *Zuniga*, ¶ 14, 372 P.3d at 1056 (quoting *People v. Hill*, 929 P.2d 735, 739 (Colo. 1996)).

¶17    When an officer obtains evidence in violation of the Fourth Amendment, "the exclusionary rule ordinarily bars the prosecution from introducing that evidence against the defendant in a criminal case." *People v. Vaughn*, 2014 CO 71, ¶ 10, 334 P.3d 226, 229. The Supreme Court has repeatedly reminded us that the only purpose of the exclusionary rule "is to deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236–37 (2011).

## B. Inventory Search

¶18    The People first maintain that the officers' seizure and inventory of the Cadillac were reasonable and constitutional. We disagree.

9

¶19 Just last year we recognized that it is axiomatic that an officer's seizure of a vehicle and subsequent inventory of its contents for "caretaking purposes" can amount to a reasonable seizure and search within the meaning of the Fourth Amendment "without regard for either probable cause or a warrant." *Brown*, ¶ 8, 415 P.3d at 817–18. As the Supreme Court has explained, "[t]he policies behind the warrant requirement are not implicated" in such seizures and searches, "nor is the related concept of probable cause." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987) (citation omitted). Rather, the reasonableness of seizures and inventory searches conducted pursuant to a community caretaking function is rooted in the purposes those seizures and searches serve—to protect against danger, loss, and even false claims of loss—and in "the routine or standardized nature of the procedures by which they are carried out." *Brown*, ¶ 8, 415 P.3d at 818.

¶20 In *Bertine*, the Supreme Court explained that its cases do not preclude "the exercise of police discretion" in determining whether to impound a vehicle, "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." 479 U.S. at 375. In so doing, "the Court implied, or simply accepted as inherent in the notion of caretaking functions, that a determination of the constitutionally required reasonableness of seizing a vehicle" and subsequently inventorying its contents "is dependent upon standardized criteria limiting police discretion." *Brown*, ¶ 10,

10

415 P.3d at 818. In other words, the Court clarified that the existence of standardized legislative or departmental criteria constitutes a necessary condition of the community caretaking exception to the warrant requirement. *Id.* While such criteria or policies need not be in writing, they must be in existence. *People v. Gee*, 33 P.3d 1252, 1257 (Colo. App. 2001).

¶21 Here, the officers seized and inventoried the Cadillac because, in the exercise of their discretion, they decided to impound it. But the People did not present any evidence at the motions hearing to establish that the officers did so in accordance with any written or oral standardized criteria or policies. In fact, the People did not introduce any evidence that such criteria or policies existed. Because the existence of standardized criteria or policies is a necessary condition of the community caretaking exception to the warrant requirement, we conclude that the seizure and subsequent inventory of the Cadillac were not reasonable and violated Allen's constitutional rights under the Fourth Amendment.[3]

---

[3] The People contend that there is no record support for a few of the district court's factual findings related to its conclusion regarding the inventory search exception. Our analysis of this exception differs from the district court's, *see Moody v. People*, 159 P.3d 611, 615 (Colo. 2007) (noting that "appellate courts have the discretion to affirm decisions . . . on any basis . . . even though they may be on grounds other than those relied upon by the trial court"), and renders this claim irrelevant.

## C. Protective Search for Weapons

¶22 The People also assert that the district court erred in rejecting their claim that the officers were entitled to conduct a protective search of the Cadillac's passenger compartment. We are not persuaded.

¶23 In *Terry v. Ohio*, 392 U.S. 1, 24 (1968), the Supreme Court concluded that when an officer has a reasonable, articulable suspicion that an individual is armed and dangerous, he may conduct a pat-down search for weapons for the purpose of his protection and that of others in the surrounding area. The following year, the Court recognized that a suspect may harm an officer with a weapon even when the weapon is not on the suspect's person and is instead in the area within his immediate control. *Chimel v. California*, 395 U.S. 752, 763 (1969), *abrogated in part by Arizona v. Gant*, 556 U.S. 332 (2009), *as recognized by Davis*, 564 U.S. at 229. Consequently, the Court in *Chimel* held that it is reasonable for an arresting officer to perform a protective search of the immediate area within an arrestee's control. *Id.*

¶24 By the time 1983 rolled around, some fourteen years later, the Supreme Court had established that: (1) the protection of officers and others can justify limited searches for weapons when there is a reasonable belief that the suspect poses a danger; (2) roadside encounters between officers and suspects are particularly hazardous; and (3) a weapon in the area surrounding a suspect may

12

give rise to a safety risk. *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). These principles, considered jointly, compelled the Court in *Long* to conclude that, during a lawful roadside encounter, an officer is entitled to conduct a protective search of the areas in a vehicle's passenger compartment where a weapon may be placed or concealed, so long as the officer possesses an articulable and objectively reasonable belief that an occupant of the vehicle may be dangerous and may gain immediate control of a weapon. *Id.* A furtive movement by an occupant of a vehicle during an investigatory stop can suffice to support a protective search of the passenger compartment. *People v. Brant*, 252 P.3d 459, 462 (Colo. 2011).

¶25 We have cautioned that the purpose of a protective search of the passenger compartment of a stopped vehicle "is not to discover evidence of crime"; rather, the purpose of such a search is to afford an officer the opportunity "to pursue an investigation without fear of violence." *Delacruz*, ¶ 16, 384 P.3d at 353. It follows that the scope and character of a protective search must be reasonably related to the purpose of ensuring the safety of the officer and others who may be present. *Id.* at ¶ 14, 384 P.3d at 353.

¶26 Officer Vaughn's protective search of the area around the Cadillac's front passenger seat, which he conducted while Allen and Cross were still at the scene, was justified by Cross's furtive movements and the information regarding the

13

possibility that Cross was carrying a handgun.[4] But the question we confront is whether the officers were subsequently authorized to conduct a protective search of the passenger compartment of the Cadillac *after* Allen and Cross had left and walked into the hotel. Leaning heavily on *Delacruz*, the People argue that the answer is yes. In our view, though, *Delacruz* is distinguishable.

¶27 *Delacruz* involved a traffic stop in a Quality Inn parking lot. *Id.* at ¶ 3, 384 P.3d at 351. We concluded there that the circumstances the patrol officer faced during the stop gave him an objectively reasonable basis to check for weapons in the passenger compartment of the SUV Delacruz was riding in, even though Delacruz and the driver had been removed from the vehicle and Delacruz had been detained and handcuffed. *Id.* at ¶¶ 22, 24, 384 P.3d at 354–55. We reasoned that an officer's physical control of a vehicle's occupants "does not necessarily negate the threat to officer safety" because "a suspect can still break away from police control and retrieve [a] weapon, or, if the suspect is not ultimately arrested, he may access weapons if permitted to return to his car." *Id.* at ¶ 24, 384 P.3d at 355. Considering those possibilities, we held that the officer's actions were justified. *Id.*

---

[4] Officer Vaughn limited his protective search to the area around the front passenger seat and did not include the rest of the passenger compartment.

¶28 In stark contrast, when the officers conducted the search in question here, they had completed their investigation, issued a traffic citation to Allen, and allowed Allen and Cross to leave and walk into the hotel. All that remained was the towing of the Cadillac, which is what prompted the inventory search. Not only were Allen and Cross no longer at the location of the stop at that point in time, they weren't even in the officers' visible vicinity. They had been released and were no longer around. Indeed, after recovering the handgun, the officers had to go look for Allen to question him and they could not question Cross because he was gone. Whatever danger the officers may have faced during this roadside encounter, it had clearly dissipated by the time they inventoried the Cadillac.

¶29 Moreover, some of the other circumstances that supported our decision in *Delacruz* are absent here. For example: Delacruz appeared to have been deceitful as to his identity; the investigatory stop took place in an area known to law enforcement for frequent criminal activity; the officer had already observed one weapon within the immediate reaching distance of one of the vehicle's occupants before the protective search was conducted; and neither of the vehicle's occupants had alerted the officer to the presence of that weapon when he questioned them separately. These circumstances paint a markedly different picture from the one depicted by the circumstances Officers Snyder and Vaughn were staring at when they inventoried the Cadillac.

15

¶30    We conclude that after Allen and Cross were allowed to leave and walk into the hotel, the officers did not have an objectively reasonable basis to conduct a protective search of the passenger compartment of the Cadillac. Therefore, the district court correctly ruled that the People's protective search argument lacked merit.

## D.  Automobile Exception

¶31    Finally, the People take issue with the district court's finding that the challenged search was not justified by the automobile exception. They contend that the officers had probable cause to believe that the Cadillac contained evidence of a crime—namely, a handgun. Though this may seem like a fairly debatable point at first glance, a closer examination convinces us to side with the district court.

¶32    The Supreme Court has made clear that, while the automobile exception requires probable cause, it "does not have a separate exigency requirement: 'If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more.'" *Maryland v. Dyson*, 527 U.S. 465, 466–67 (1999) (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996)). "A police officer has probable cause to conduct a search when the facts available to him would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Bailey*, ¶ 20, 427 P.3d

at 827 (internal quotation marks and alterations omitted) (quoting *Florida v. Harris*, 568 U.S. 237, 243 (2013)). In analyzing probable cause, we consider "the totality of the circumstances." *Id.* (quoting *Mendez v. People*, 986 P.2d 275, 280 (Colo. 1999)).

¶33 "The probable cause standard does not lend itself to mathematical certainties and should not be laden with hypertechnical interpretations or rigid legal rules." *Id.* at ¶ 21, 427 P.3d at 827 (quoting *People v. Altman*, 960 P.2d 1164, 1167 (Colo. 1998)). Instead, we are required to "make a practical, common-sense decision whether a fair probability exists that a search of a particular place will reveal contraband or evidence of a crime." *Id.* (quoting *Altman*, 960 P.2d at 1167). Thus, we have explained that probable cause is "based on factual and practical considerations of everyday life on which reasonable and prudent people, not legal technicians, act." *Id.* (quoting *Mendez*, 986 P.2d at 280).

¶34 While certain facts, considered alone, may not suffice to establish probable cause, "those same facts may support a finding of probable cause when considered in combination." *Id.* at ¶ 22, 427 P.3d at 827 (quoting *Grassi v. People*, 2014 CO 12, ¶ 23, 320 P.3d 332, 338). Even lawful circumstances, when considered in conjunction with one another, may "lead to a legitimate inference of criminal activity." *Id.* (quoting *Altman*, 960 P.2d at 1171).

¶35 Applying these legal precepts, we concentrate attention on the totality of the relevant circumstances here:

17

- As Officer Snyder pursued the Cadillac at a slow speed in the hotel parking lot, he observed Cross duck his head down several times, so as to possibly hide something under his seat.

- Allen did not immediately pull over and could not provide the Cadillac's registration or proof of insurance.

- Officer Snyder had been told by other officers in the days or weeks preceding the stop that Cross was possibly carrying a handgun.

- Shortly after conducting a pat-down of Cross for weapons, Officer Vaughn found a live bullet under the front passenger seat of the Cadillac.

- When asked if there were guns or illegal drugs in the Cadillac, Allen replied that he was a convicted felon and was not allowed to own a gun.

The People posit that these circumstances gave the officers probable cause to believe there was a handgun in the Cadillac. Were the analysis that straightforward, the People's contention might possibly carry the day. But, as is often the case in the law, things are not as simple as they seem.

¶36 A handgun would only have been evidence of a crime if it had been in Allen's possession. After all, Allen was admittedly a convicted felon who could not legally possess a handgun. But the record is barren of any evidence that Cross could not legally possess a handgun. Indeed, one of the officers admitted at the motions hearing that he had no indication that Cross was prohibited from carrying a handgun. Yet, Officer Snyder saw only Cross duck his head down to possibly hide something. Further, whatever Cross may have been attempting to conceal, he appeared to be storing it under his seat, not Allen's seat, and Officer Vaughn

18

had already searched under Cross's seat for weapons and had located none, though he had recovered a live bullet from that area. And, while Officer Snyder had been told in the preceding days or weeks that Cross was possibly carrying a handgun, no officer had received such information about Allen.

¶37 When we consider all the circumstances together and view them in a practical and common-sense manner, we reach the same determination the district court did: At the time of the officers' inventory search, there was not a fair probability that the Cadillac contained evidence of a crime. Therefore, the district court correctly rejected the People's automobile exception argument.

## V. Conclusion

¶38 We conclude that the district court did not err in granting Allen's request to suppress the handgun and methamphetamine seized from the Cadillac. Therefore, we affirm its suppression order.